## James M. Lyon et al. *v.* John Knott et ux.

The rights of L. to the slaves in controversy originated in a contract of marriage, which was solemnized under and is governed by the laws of this State; and those rights are to be adjudicated upon in its courts. The laws of descent and distribution of other States have no operation within the jurisdiction of this State, except upon a principle of national comity; but in determining the rule which, according to the *jus gentium privatum*, would govern the question under consideration, and which would be adopted by the courts

of this State, it is necessary to ascertain the rule which would be applied to the subject by the courts of the State of Texas, where L. resided at the decease of his wife.

*King* v. *Marshall*, 24 Miss. R., cited and confirmed by the court.

The contract of marriage has not been made an exception to the well understood rule of common law, that the law of the place where contracts are entered into, unless made with reference to their performance in another place, is to regulate and determine the relative rights and obligations of the parties making them, subject to the exceptions to this rule.

Where there is no express matrimonial contract, the law of the matrimonial domicil will govern as to all the rights of the parties to their present property in that place, and as to all personal property everywhere.

And where there is no change of domicil, the same rule will apply to future acquisitions, as to present property; but if there be a change of domicil, the law of the actual domicil, and not the matrimonial domicil, will govern as to all future acquisitions of movable property.


On appeal from the superior court of chancery; Hon. Stephen Cocke, chancellor.

John Knott and Elizabeth Knott, his wife, filed their bill in the superior court of chancery against James M. Lyon and others, to recover certain slaves in their possession; and they charge in their bill, that the said Lyon, some time in the year 1844, in this State, in the county of Copiah, intermarried with Malissa Speed, who, at the time of marriage, owned and possessed in her own right a number of slaves. That after the marriage of the parties, they removed to the State of Texas, and there became domiciled; and that Mrs. Lyon died in the State of Texas, with the slaves then in her possession; and it is further charged that Mrs. Lyon left no children at her decease, and by force of the law of Texas, that the said slaves, owned by her upon her death, became by descent the sole and separate property of Mrs. Knott, who was the sister of Mrs Lyon, and her next of kin. That Lyon fraudulently, and to defeat the rights of Mrs. Knott, removed the said slaves secretly from Texas to this State, and now has possession of a portion of them, and the other portion he has sold, &c.

The bill was demurred to by Lyon, but the court overruled the demurrer; and Lyon prayed and obtained an appeal to this court.

*D. C. Glenn* for appellants.

But for the act of 1839, upon the consummation of the marriage contract, these negroes would have become the absolute property of Lyon against the world.

The act of 1839, § 4, has controlled this legal consequence of the marriage contract to this extent namely : —

" She may hold these slaves as her separate property during her life, exempt from the liability or debts of her husband; and

" In case of the death of the wife, such slaves descend and go to the children of her and her said husband jointly begotten ; and in case there shall be no child born of the wife during such her coverture, then such slaves shall descend and go to the husband and his heirs."

Under the provisions of this law, so completely were the beneficial uses of such property vested in the husband, as considered by the courts, that the legislature again interposed and passed the amendatory act of 1846. *G. Gulf Bank* v. *Barnes,* 2 S. & M. 165; *Beatty* v. *Smith,* Ib. 567; *Baynton* v. *Finnall,* 4 Ib. 192.

Before the passage of the act of 1839, " Lyon became entitled, by his marriage, to all the goods and chattels of his wife, and to the rents and profits of her lands." 2 Kent, 129, 130.

By the 1st, 2d, and 3d sections of the act of 1839, a life interest therein was secured to the wife, free from the debts of the husband. By the 4th section, the control and profits of negroes was secured to the husband.

Fearne defines a vested right to be " an immediate fixed right of present or future enjoyment," or where " the interest does not depend on a period or an event that is uncertain." Cont. Rem. 1.

Chancellor Kent says : " An estate is vested where there is an immediate right of present enjoyment, or a present fixed right of future enjoyment," quoted by CLAYTON, J., in *Clark* v. *McCreary,* 4 Com. 202.

An accurate definition of Lyon's interest upon marriage, under the act of 1839, embraces the sense of both branches of the last rule.

There was a right of future enjoyment, fixed absolutely by the law; a present absolute right of future enjoyment. By

the same law, 4th section, there was vested in him an absolute fixed right of present enjoyment, namely, the control and proceeds of the property.

The cases quoted by opposing counsel do not sustain him in his argument. The court simply announces, in *Clark* v. *McCreary*, that personal property not in possession of the wife does not, at common law, vest absolutely in the husband; but he has a conditional and contingent right to such property, dependent on his reducing it to possession. All which is true; and by the bill it appears that, as soon as we married, we reduced to possession our wife's distributive share, consisting of these negroes, and have held the same ever since. The decision in *Clark* v. *McCreary*, is exactly in point for me. The court say, "our right was a qualified one, upon condition that we reduced the property into possession during coverture; and this condition must take place before the estate can vest."

In *Kneeland* v. *Ensley*, Meigs, R. 627, Judge Turly quotes Story, Conf. 143, 189, and pronounces as settled law, "That the law of the matrimonial domicil is to prevail as to the wife's movable property; and if there has been a change of domicil after marriage, the law of the new domicil shall govern the right of the husband as to the movable property of the wife acquired after the change, and not the *lex loci contractus.*"

From the cases of *Saul* v. *His Creditors*, 17 Mart. La. R., *Murphey* v. *Murphey*, and *Gales* v. *Davis's Heirs*, while they very distinctly settle that all acquisitions of property, after a removal to Louisiana, are subject to its laws, yet they all admit that property possessed at the time of marriage, or acquired before removal, is regulated by the law of the matrimonial domicil.

The case of *Mahorner* v. *Hooe*, 9 S. & M. 235, is cited as an authority for appellees. I am perfectly willing to rest my case on Judge Sharkey's conclusion, so far as it relates to this case at all. The testator in that case died in Virginia. By his will, he emancipated his slaves. This, by the laws of Virginia, he could do. In Mississippi, he could not. It was insisted, as he died in Virginia, and such a devise was valid there, as an act of comity, it should be enforced here. This court refused, be-

cause the act of 1842 had prohibited such a devise, and made it illegal.

Though this is a case of first impression in Mississippi, however complex and doubtful such cases are generally, yet, as it is presented by the facts of this case, there is no point susceptible of a more easy or a more satisfactory solution.

In addition to the authorities, I ask leave to cite,

On the analogies of the common law, 17 Johns. 511; 1 Rand. 15; 10 Wheat. 367.

On the rule of the civil law writers, Story, Confl. L. §§ 146, 156; Ib. § 186, &c.

*Potter* for appellees.

A State may prohibit the operation of all foreign laws, and the rights growing out of them, within its own territories. It may prohibit some laws, and it may admit the operation of some others. It may recognize and modify and qualify some foreign laws. When its own code speaks positively on the subject, it must be obeyed by all persons who are within the reach of its sovereignty. When its customary, unwritten, or common law speaks directly on the subject, it is equally to be obeyed. When both are silent, then, and then only, can the question properly arise, what law is to govern in the absence of any clear declaration of the sovereign will. Story, Confl. L. 24; *Saul v. His Creditors,* 5 Mart. La. R.

Here the rule is laid down clearly and explicitly. The Texas law being to the very point, is to govern. What more can be said against us? Why, there is the pretence that Texas law is unjust, and therefore Mississippi law is to be administered since the slaves are here, no matter how, or by what fraudulent contrivance they were removed from Texas. Let us see what force there is in this defence. The recognized rule is this: " The laws of a sovereign rightfully extend over all persons who are domiciled within his territory, and over property which is there situate." Story, Confl. L. 450.

" In regard to foreigners resident in a country, although some jurists deny the right of a nation generally to legislate over them, it would seem clear, upon general principles of interna-

Lyon et al. *v.* Knott et ux.

tional law, that such a right does exist; and the extent to which it should be exercised, is a matter purely of municipal arrangement and policy. All persons who are found within the limits of a government, whether their residence is permanent or temporary, are to be deemed the subjects thereof." Story, Confl. L. 452, 453 ; Ib. 86, 102, 108.

" A nation, within whose territory any personal property is actually situate, has as entire dominion over it while therein, in point of sovereignty and jurisdiction, as it has over immovable property situate there. It may regulate its transfer, and subject it to process and execution, and provide for and control the uses and disposition of it, to the same extent that it may exert its authority over immovable property." Story, Confl. L. 462.

" The law of the actual domicil of the owner at his death regulates the distribution of his personalty." Story, Confl. L. 403, 404.

Apply these rules to the case at bar, and they give this property to Mrs. Knott. Is there a reason why they should not be enforced? None whatever. Lyon voluntarily submitted himself and the property to Texan law, knowing what that law was, and how these slaves would be disposed of by that law, in the event of the death of his wife. He chose his lot there, and agreed to abide Texan law. Can he complain of his own deliberate act? Never. Can the courts of Mississippi set up the Mississippi law as a sort of *ex gratiâ* law in his favor? No; and for two reasons. Title had already vested in Mrs. Knott before Lyon ran off the slaves, and you cannot divest that title. By the very rules invoked for him, this court is bound to recognize the Texan title. Take the case of a divorce, not permitted by the law of the marriage domicil, granted by the court of another country. Is there a pretence that such divorce is not valid even at the place of marriage, if the parties were domiciled at the place of the decree where it was rendered? None at all. Story, Confl. L. 187.

The laws of England forbid a divorce, except for special causes. English subjects marry in England, and afterward remove to France, and a divorce is obtained for a cause prohibited in England. Such divorce is valid in England. But

if the equity invoked for Lyon in this case is to prevail, an English married husband divorced in France for cruelty whilst domiciled there, has but to seize his late wife and carry her across the channel, and straightway his marital rights are supreme again.

Again, why should we grant to a Texan fugitive, what we refuse to our own citizens? You insist upon extending to Lyon the benefit of his Mississippi marriage contract; might a Mississippian claim the like protection here? Not at all. Prior to the act of 1839, the right of the husband, under a Mississippi marriage, was to take and hold all the personalty that might come, generally, to his wife during the coverture; and to reduce into possession, or sell, at any time during the coverture, the choses in action of his wife. The act of 1839 deprived him of those rights, and this court affirmed the validity of the statute. *Clarke* v. *McCreary*, 12 S. & M. 347; *Duncan* v. *Johnson et ux.* 23 Miss. 130. What was the ground of decision? That the husband had no vested rights in those particulars.

Had Lyon a vested right to these slaves by survivorship, under the act of 1839, in the event of the death of his wife without issue? If he had no vested right to what she might acquire during coverture, how could he have such right to what she might leave at her death? The case is precisely within the rule of *Clarke* v. *McCreary*. The act of 1846 was intended to affect husbands married under the act of 1839, as well as others. Is that act so far invalid, that a husband, married in 1840, takes the slaves of his wife if she dies without issue of the marriage? No. The husband has not, pending coverture, any vested right of survivorship in the personalty of his wife. He stands precisely as any other distributee or heir expectant, and may be precluded by a change of the law. If the husband has a vested right, so has the issue of the marriage, and we have thus a sort of conditional estate tail, in personalty, created by implication, against the settled policy of our law on the subject. In our view, the husband stood under the act of 1839, precisely as the children of a man now do, with regard to such personalty as he may die possessed of. If the law remains in force until the father dies, the children take as distributees. But the legislature may change the law before their rights vest, and declare a

new course of distribution, precluding the children ; so, as to the husband, under the act of 1839, Lyon had not, by virtue of his marriage, a vested right of survivorship in the slaves.

This court has decided, that issue born under the act of 1839, of a marriage contracted under that act, have no vested right of inheritance in slaves possessed under it; and it is difficult to conceive how the more remote right of the husband can be regarded as a vested right. *Marshall* v. *King*, 24 Miss. R. 89.

In cases like this, the law of the domicil is to govern. *Gaillard* v. *Rowan*, 2 S. & M. 617.

Mr. Chief-Justice Smith delivered the opinion of the court.

This bill was filed in the superior court of chancery, to recover certain slaves, claimed by the appellee Mrs. Knott, under the law of the State of Texas, regulating the descent and distribution of personal property. A demurrer was filed to the bill, which was overruled, and an appeal taken to this court.

The facts alleged in the bill are as follow, to wit: — The defendant Lyon intermarried with Mrs. Malissa Speed, in the month of April, 1844. The marriage was celebrated in Copiah county in this State, where both parties were then domiciled. Mrs. Speed, who was the widow of John Speed at the date of the marriage, was entitled to a number of slaves, as her distributive share of her deceased husband's estate. Those slaves, which are now the subject of controversy, were within a short time after the marriage, received and reduced into possession by Lyon and wife. About one year afterwards, Lyon taking with them the slaves, removed with his wife from Copiah county to the State of Texas, where they became domiciled, and where they continued to reside until the death of Mrs. Lyon, which occurred in 1847. Mrs. Lyon died intestate and without issue, leaving no brother or sister except the complainant Mrs. Knott, who, as next of kin under the Texan law, was entitled to the slaves belonging to her succession, as sole distributee, and in exclusion of her husband Lyon. After the death of his wife, Lyon, with the fraudulent intention, as it is alleged, of defeating the rights of complainants, removed the slaves into this State. Since their removal he has sold a part of them, and refuses to deliver the remainder.

As it is manifest that the transfer of the slaves from the jurisdiction of Texas to that of Mississippi has in no respect affected the rights of either party, those rights, whatever they are, exist now precisely as they did upon the death of Mrs. Lyon. Hence, if under the statute of descents and distribution of the State of Texas, a title to the slaves vested in Mrs. Knott, the courts of this State will, upon a principle of national comity to which there are but few exceptions, enforce that title precisely as it would be done in the courts of the former.

It is admitted, if the marriage had taken place in Texas instead of Mississippi, that Lyon's marital rights would not have attached to the slaves, which would have gone to Mrs. Knott as next of kin, and the person entitled to the succession under the law of that State. But although Lyon and wife had their domicil in Texas at the time of the death of the latter, the marriage, as we have seen, was celebrated in this State. Hence arises the question whether the laws of Mississippi regulating the rights of husband and wife, or the Texan law of descents and distribution, is to determine the rights of the parties to the slaves in controversy.

It is very manifest, if Lyon, under the law of this State, by his marriage with Mrs. Speed, acquired no fixed or vested right to her slaves, which he received into his possession, which would not terminate on her death, that they did upon her death constitute a portion of her distributable estate; and which in its disposition is to be controlled exclusively by the laws of Texas. Upon this hypothesis, the decree of the chancellor was undoubtedly correct. On the other hand, if Lyon by the marriage was vested with a fixed right or interest in the slaves, which, upon the death of his wife without issue born of the marriage, would devolve upon him the absolute title in fee-simple, that upon the well understood rules of national comity, the slaves ought not to be regarded as belonging to the estate of Mrs. Lyon, and consequently not subject to disposition under the Texan statute of descents and distributions. Our first subject of inquiry is, therefore, of the character and extent of the interest or rights to the slaves in controversy, which vested in Lyon under the law of this State and by virtue of the marriage.

Prior to the passage of the act of the 15th February, 1839, for the preservation and protection of the rights of married women, the common law rule, without modification, existed by which the husband, upon the marriage, became vested with the absolute right and title to all the personal property of the wife in her possession at the time of the marriage, or which he should reduce into possession during its continuance. By that statute a very material change was made in the marital rights of the husband in regard to the personal estate of the wife, consisting of slaves. By the second section, it was provided, that, "when any woman possessed of a property in slaves shall marry, her property in such slaves, and their natural increase, shall continue to her notwithstanding her coverture, and that she shall have, hold, and possess the same as her separate property, except from any liability for the debts or contracts of the husband. And by the fourth section, "that the control and management of all such slaves, the direction of their labor and the receipt of the productions thereof, shall remain to the husband, agreeably to the laws then in force." In case of the death of the wife, such slaves shall descend and go to the children of her and her husband jointly begotten; and in case there shall be no child born of the wife during such her coverture, then such slaves (shall) descend and go to the husband and his heirs." Hutch. Dig. 496, 497.

The provisions of this statute have been frequently the subject of comment and construction in this court; but no case has arisen in which the character and extent of the rights acquired by the husband, under its operation, in the slaves of the wife, have been ascertained and established by a deliberate and direct adjudication. The case of *Clark* v. *McCreary*, 12 S. & M. 347, was referred to in the argument as having a direct and important bearing on the question under examination; but we do not perceive that it has any relevancy whatever to the question of the husband's interest in the slaves. In that case the marriage of McCreary with Mrs. Clark occurred before the enactment of the statute. A right in action to the slaves, afterwards the subject of litigation, existed in Mrs. Clark at the time of her marriage with McCreary; but McCreary did not reduce them into

47 *

his possession until after the statute went into operation. The question, therefore, was not as to the nature or extent of the interest which the husband acquired by a marriage under the act, in the slave property of the wife, but whether the property inured to the separate use of Mrs. Clark under the statute, or whether the possession, acquired after its adoption, vested the title absolutely in McCreary. The determination of that question necessarily depended upon the right or title which the husband at common law acquired to the choses in action, and personal property of the wife not in her possession at the time of the marriage. And it was held that the interest acquired by the husband in the wife's choses, was not a right which was vested absolutely in him, but which was an inchoate or qualified right upon condition that he reduce them into possession during coverture ; and hence, as the law was passed before the condition was performed, the right of the husband in that case was intercepted.

In the case of *Kell* v. *Fowler*, 14 S. & M. 68, it was strongly, but in very general terms, intimated, that the husband, by a marriage contracted under the act of 1839, did not acquire a vested right in the slave property of the wife. But in that case the decision turned exclusively upon the marriage contract which had been entered into by Fowler with Mrs. Kell prior to their marriage, the late chief-justice, who delivered the opinion of the court, observing, that "it was unnecessary to consider the effect of the acts of 1839 and 1846 in relation to the rights of married women. This contract (the marriage contract) is the law of the case. But if these acts alone controlled the case, the result would probably be the same, as the husband had no such vested interest, under the act of 1839, as that claimed for him." The case of *Clark* v. *McCreary* is referred to as authority for the intimation thrown out by the court. It is very manifest that this opinion was expressed without any very careful examination of the subject, and without a deliberate purpose of settling the construction of the act in reference to the question. For these reasons, we do not feel authorized to repose upon the authority of that case, as settling its construction in reference to the rights of the husband.

Lyon et al. *v.* Knott et ux.

In *King* v. *Marshall*, 24 Miss. R. 85, the clause of the 4th section, which gives the slaves, after the death of the wife, to the children born of the marriage, was regarded strictly in the light of a statute of descents and distribution, under which no rights vested in the children during the life of the wife. And hence, that it was competent for the legislature to alter or to repeal it, so as to change the rule of descent, at any time before the death of the wife.

As there are no heirs to the living, the rights of heirs and distributees arise from the death of the ancestor. Until that event occurs, the children have no vested interest in the estate of their ancestor. The only interest they have is the right to inherit and possess his estate, of which he shall die seized, and of which he has made no valid testamentary disposition, according to the laws of descent which may then be in force, no matter how different or contrary thereto the laws may have been when the estate was acquired. If it be true, therefore, as maintained in argument, that the provision of the 4th section of the act, which defined the rights of the husband, acquired by marriage under it, to the slaves of the wife, is simply an ordinary statute of descents, those rights are not vested absolutely. The interest of the husband, thus acquired, if it can be regarded as a right at all, in the proper sense of the term, is not only conditional, but is imperfect and inchoate. The interest is of precisely the same nature and extent as the interest of the children of the marriage during the life of the wife.

It is true that the same language is employed in providing for the descent of the slaves to the children of the marriage, which is used in defining the rights of the husband to the property after the death of the wife, where she dies without issue. In the one case, it is provided that the slaves " shall descend and go to the children of the husband and wife jointly begotten;" in the other, they " descend and go to the husband and his heirs." If we do not, therefore, look beyond the words of the clause containing this provision, to the subject-matter and objects of the act, the question is one of very easy solution. We would be compelled to adopt the same construction which has been put upon the clause in reference to the children

of the husband and wife jointly begotten; to hold that the property does not vest in the husband, upon the death of the wife, by virtue of his marital rights, but that he takes it as a special heir to the wife, having acquired by the marriage no other or greater interest than a right to inherit the property, provided the law regulating the descent shall remain in force, and the conditions arise which are specified in the act. But we apprehend, that the rights of the husband, arising under the act, stand on a different foundation, and are different in character and extent from those of the children born of the marriage.

Marriage at common law operated as an absolute gift to the husband of the personal chattels of the wife in her possession at the time. The choses of the wife, when reduced into possession during coverture, became equally his absolute property. Hence, upon the consummation of the marriage, the whole personal property of the wife was instantly liable for the debts of the husband, and subject to his unlimited right of alienation. It might be transferred without consideration to strangers, wasted in folly and extravagance, or lost by his misfortune. In either case, the law offered neither assistance nor protection. However ample the fortune which the wife, upon the marriage, brought to the husband, the law made no provision out of it for her support, or the support and maintenance of the children of the marriage. These were the evils which the legislature designed to provide against by the adoption of the statute. To effect the purposes of the legislature in the manner proposed, it was necessary to enlarge the privileges and capacities of *femes covert* to acquire and to hold property in their own right as separate estate; and, as a necessary consequence, to abridge, in a corresponding ratio, the married rights of husbands. The capacity to acquire and hold property conferred upon *femes covert*, and the separate estate in her slaves, secured to the wife, was so much deducted from or carved out of the rights of the husband at common law, arising out of the contract of marriage. Upon the clearest principle, therefore, those rights of the husband are not to be considered as restricted or abrogated, unless by the express and positive language

of the statute, or by necessary implication.   Although the husband was entitled, absolutely, to the usufruct in the slaves, by the express provisions of the statute, they remained to the wife as her separate estate, and in the event of children being born of the marriage, they descended to them.   The marital right of the husband, in virtue of which he would have been vested with the absolute title to the slaves, was that far, and only that far, taken away or suspended.   No right of present enjoyment attached as to the ultimate fee in them.   But it is manifest, according to the recognized rules of construction, if nothing further had been said in reference to the disposition of the property, that, upon the death of the wife, without joint issue of her and her husband, he would take it by virtue of the *jus mariti*.   The general effect and operation of the act was to suspend rather than to unconditionally repeal the rights of husbands, as they then existed.   Upon this view, the last clause of the 4th section, which provides, upon the death of the wife without issue of the marriage, that the slaves " descend and go to the husband," secures no right which, without the provision, the husband would not have been entitled to.   There is no reason arising out of the purposes and objects which it was the intention of the legislature to accomplish, which would render it consistent and proper that the husband should take the slave property of the wife, upon her death, as an inheritor or distributee, instead of succeeding to it as a right incident to the contract of marriage, as regulated by the law.

There is certainly one circumstance which plainly distinguishes the rights of the husband from the interest of the children born of the marriage, or which children generally, before the death of their ancestor, possess in his estate.   The interest of the children, as we have seen, before the death of the wife, is in no sense of the term a vested right.   But whether the husband takes the slaves held by the wife as her separate estate by inheritance or not, it cannot be doubted that, by virtue of the marriage under the act, he acquires a right in reference to the slaves which is of a fixed and definite character, and of which he cannot be deprived without his own consent.   For these reasons, we think that the husband does not

succeed to the slaves of the wife, held by her under the statute, as her separate estate by inheritance; but that they vest in him under the law, and by virtue of the marriage.

Our next inquiry is, whether the title or interest acquired by the husband to the slaves of the wife is a fixed and vested right. And if upon inquiry it shall be found to be of that character, there will be no pretence for saying, that the title of Lyon to the property in controversy, was intercepted by the statute of descents and distribution of Texas, where, as we have seen, Lyon and wife had their domicil when Mrs. Lyon died; and hence, that the property constituted a part of her succession, and was, as such, subject to distribution, according to the laws of that place.

It is a matter frequently attended with difficulty, to determine whether a right is vested or contingent. " The lines of distinction," says Chancellor Kent, " between vested and contingent remainders are so nicely drawn, that they are difficult to be traced; and, in some instances, a vested remainder would seem to possess the essential qualities of a contingent estate.'' Without attempting to trace these lines, or to discriminate between the nicer shades which distinguish the boundaries of estates which are vested, from those which are contingent, it will be sufficient to refer to the more general rules which distinguish between vested and contingent estates. Mr. Fearne defines a vested right to be an immediate fixed right of present or future enjoyment. Fearne on Rem. 1. Chancellor Kent says, an estate is vested when there is an immediate right of present enjoyment, or a present fixed right of future enjoyment. 4 Kent, Com. 202. An estate or use is said to be in contingency whenever it is uncertain whether the estate or use, limited to take effect *in futuro*, will ever vest; but, according to the same authority, the uncertainty whether the remainder will ever take effect in possession, will not prevent it from being a vested remainder, provided the interest be fixed. It is the present capacity of taking effect in possession, if the possession were to become vacant, that distinguishes a vested from a contingent remainder. 4 Kent, Com. 203.

If the fee in the slaves which would go to the husband, in

case the wife should die without children jointly begotten by her and her husband, be regarded as an estate in remainder to take effect upon the death of the wife, according to strict technical principles, the interest of the husband in the slaves acquired by marriage would be a vested right. It is manifest, that that interest or right, whatever it be, is fixed. The remainder may never take effect in possession. The husband may die before the wife, or the wife may die, leaving children of the marriage; but that uncertainty does not prevent the remainder from vesting, as the interest is fixed by the marriage, and the right vested to have the estate on the terms prescribed in the statute. This is still more evident, if the statute be held not to repeal unconditionally, but to suspend the marital rights of the husband. Upon that view, the interest of the husband is clearly a present fixed right of future enjoyment.

If a remainder be limited upon an estate tail, it will be held to be a vested remainder. For example : If a devise be made to A. and the heirs of his body, and in default thereof, to B., the remainder to B. is vested. 4 Kent, 203, note. Let us suppose that a bequest be made to the wife of A. B., of an estate in slaves of precisely the character and extent with that which a *feme covert* holds in the slaves which she owned at her marriage, with remainder to the children jointly begotten by herself and husband, and in default thereof, to the husband A. B., if he should be the survivor. We would have then the exact terms of the statute embraced in the devise. In such case it would be uncertain whether the remainder to the husband A. B. would ever take effect in possession ; for children might be born of the marriage, or the wife might survive the husband; but as the interest of A. B. would be fixed, and a present capacity, to take effect upon the death of the wife without issue, would exist, according to the most respectable authority the remainder would be vested in A. B. 4 Kent, Com. 204, note.

If the marriage in Mississippi had operated as an absolute conveyance of the slaves in controversy to Lyon, there would be no ground to contest his right to them. The courts of no State in Christendom would look beyond the contract of marriage, if the effect of that contract were the investiture of the

husband with the absolute title to the property of the wife, for the purpose of ascertaining whether the property in contest was the property of the wife prior to the marriage. The title of the husband in such case would stand on the same foundation with a title acquired by purchase or inheritance. But the interest with which Lyon was vested by the marriage was not the absolute and unqualified title to the property; but only the usufruct for life, with a right to it in fee, in case Mrs. Lyon should die, having no issue of the marriage. Mrs. Lyon died without issue, and Lyon, undoubtedly, according to the laws of this State, was entitled to the slaves. We come, then, to the question, and it is the only one remaining in the case, whether Lyon's rights, arising under the laws of this State, should be recognized by the courts of Texas, or whether disregarding them, the property should descend and be distributed according to the laws of that State.

The question here presented has never been directly adjudicated in this court; and we are uninformed whether or not it has ever been passed upon by the courts of Texas. It is one of those questions arising upon the conflict of the laws of different States, which, as properly remarked by the supreme court of Louisiana, in the case of *Saul's Heirs* v. *His Creditors*, are frequently the most embarrassing and difficult of decision of any that can occupy the attention of courts of justice. The discordant opinions of commentators upon this branch of jurisprudence, and the conflicting decisions of judicial tribunals, have left it in a condition, at least of great doubt and uncertainty. But the question under consideration is one of the few in relation to marriage, and its incidents, arising upon the conflict of laws, about which it appears there is greater unanimity of opinion among jurists, and less conflict in the decisions of courts, than is found to exist generally in reference to questions of that character.

The contract of marriage has not been made an exception to the well understood rule of the common law, that the law of the place where the contracts are entered into, unless they are made with reference to performance in another place, is to regulate and determine the relative rights and obligations of the

parties making them; although many very important excep-
tions have been ingrafted upon the rule.   Where parties con-
tracting marriage have entered into an express antenuptial
contract, that contract will, of course, furnish the rule which
will govern in regard to matrimonial property, and will, upon
recognized principles, be carried into effect in every jurisdiction,
subject of course to the exceptions which are applicable to all
other classes of contracts.

It has been held by many eminent jurists, that where a mar-
riage has been contracted, without an express marriage con-
tract, the parties are presumed to have contracted with refer-
ence to the law of the country in which the marriage was
celebrated; and that the laws regulating the institution of mar-
riage and its incidents, being personal and not real statutes, this
tacit contract follows them. into any other jurisdiction.   And
hence it has been holden, that not only the property possessed
by them in the matrimonial domicil, but such property as they
possessed elsewhere or might have acquired after removal from
the matrimonial domicil, would be governed by the laws of the
country where they were domiciled at the time of the marriage.
*Saul* v. *His Creditors*, 5 Mart. R. (N. s.) 599; Story, Confl. L.,
ch. 6, § 1 57.

The supreme court of Louisiana, in the case above cited of
*Saul* v. *His Creditors*, after an elaborate and very profound in-
vestigation of this subject, dissented from this.doctrine, so far
as it relates to the property acquired after the removal from the
matrimonial domicil.   Judge Story concurs in that opinion
with the supreme court of Louisiana.   But that court, while
refuting the doctrine which applies the tacit contract which is
assumed to attend the fact of marriage, to property acquired
subsequently to the removal from the jurisdiction in which the
parties were domiciled at the time of the marriage, announced
the true rule to be, " that where there is no express nuptial con-
tract, the law of the matrimonial is to govern as to the ante-
cedent property." *Saul* v. *His Creditors*, 5 Mart. R. (N. s.) 605,
606; *Gale* v. *Davis's Heirs*, 4 Mart. R. 545; *Le Breton* v. *Non-
chet*, 3 Ib. 60.

Judge Story has given his unqualified approbation to this

doctrine. He says, "in general, the doctrines thus maintained in Louisiana will, most probably, form the basis of the American jurisprudence on this subject. They have much to commend them in their intrinsic convenience and certainty ; and they seem best to harmonize with the known principles of the common law in other cases." The following propositions, amongst others, are laid down by the learned judge, as those which, although not universally established in America, have much of domestic authority for their support, and none in opposition to them. " Where there is no express contract, the law of the matrimonial domicil will govern as to all the rights of the parties to their present property in that place ; and as to all personal property everywhere, upon the principle that movables have no *situs*, or rather, that they accompany the person everywhere." " And where there is no change of domicil, the same rule will apply to future acquisitions, as to present property. But where there is a change of domicil, the law of the actual domicil, and not the matrimonial domicil, will govern as to all future acquisitions of movable property." Story on Confl. L., ch. 6, §§ 183, 186, 187.

In the case of *Kneeland* v. *Ensly*, Meigs, R. 620, these principles appear to have been fully recognized and unanimously adopted by the supreme court of Tennessee. They possess the high merit of convenience and certainty, and seem to harmonize well with the rules of the common law in reference to other classes of contracts. These rules have been sanctioned by the most learned jurists and the ablest judicial tribunals, and we yield to them our approval.

Lyon's rights to the slaves in controversy, originated in a contract of marriage, which was solemnized under, and governed by, the laws of this State. And those rights are to be adjudicated upon in its courts. " The laws of every State have force, only within the limits of its own government, and bind all who are subjects thereof ; " but they possess no extra-territorial force or jurisdiction. The laws of Texas regulating descents and distribution, have, therefore, no operation within the jurisdiction of Mississippi, except upon a principle of national comity ; but comity being a principle of the law of nations, may be said to

constitute a part of the civil jurisprudence of every State, which claims to belong to the community of civilized nations.   It is upon that ground that we have noticed the claims of the appellees arising under the Texan laws.   And in determining the rule which, according to the *jus gentium privatum*, would govern the question under consideration, and which would be adopted by the courts of this State, we necessarily ascertain the rule which would be applied to the subject by the courts of Texas. For not being informed whether the rule of decision on this subject has ever been settled in that State, we must presume that the same rule would be adopted by her courts, which has been applied by this court.

This cause is before us upon a reargument, and after a careful reëxamination of all the questions involved in the controversy, we have reached the same conclusions which we did on the previous occasion.

Let the decree be reversed, and the bill dismissed.