MALCOLM CAMERON *vs.* JOHN T. CAMERON, Guardian, &c.

By the act of 1839 in relation to married women (Hutch. Co. 497, § 4), it is provided, where any woman possessed of property in slaves shall marry, her property in such slaves, and their natural increase, shall continue to her, notwithstanding her coverture; and she shall hold and possess the same as her separate property, exempt from any liability for the debts or contracts of the husband; and that the control and management of their labor, and the receipt of the production thereof, shall remain to the husband, agreeably to the laws heretofore in force. In case of the death of the wife, such slaves shall descend and go to the children of her and her husband jointly begotten; and in case there shall be no child born of the wife during such her coverture, then such slaves shall descend and go to the husband and his heirs. *Held,* that under this statute, the husband, by virtue of a marriage contracted, acquires a right for his own life to the usufruct of the slaves of the wife, in the event she should die first, leaving issue of the marriage.

*Knott* v. *Lyon,* 26 Miss. 548, cited, explained, and confirmed, as applicable in principle to this case.

The personal property of the wife must be considered as unaffected by the

provisions of the statute, unless where they are changed by express provision, or where the intention to alter them arises from necessary implication.

Under this statute, the marriage contract may be regarded as operating as a gift or grant of the usufruct of the slaves to the husband, and he will be entitled to it for his own life.

On appeal from the probate court of Madison county; Hon. A. P. Hill, judge of the probate court of Madison county.

The facts of this case present the sole question, whether a man who marries a woman in this State since the passage of act of 15th of February, 1839, to secure the rights of married women, is entitled to the usufruct for life of the slave property of his wife, after her death, leaving issue of the marriage surviving.

*Yerger* and *Rucks,* for appellant.

In the case of *Knott* v. *Lyon,* 26 Miss. 548, the chief justice remarks, that " marriage at common law operates as an absolute gift to the husband of the personal chattels of the wife in her possession at the time. The choses of the wife, when reduced into possession during coverture, became equally his absolute property. Hence, upon the consummation of the marriage, the whole personal property of the wife was instantly liable for the debts of the husband, and subject to his unlimited right of alienation. It might be transferred without consideration to strangers, wasted in folly and extravagance, or lost by misfortune. In either case, the law afforded neither assistance nor protection. However ample the fortune which the wife, upon the marriage, brought to the husband, the law made no provision out of it for her support, or the support and maintenance of the children of the marriage. This was the evil which the legislature designed to provide against by the adoption of this statute. To effect the purpose of the legislature in the manner proposed, it was necessary to enlarge the privileges and capacities of *femes covert* to acquire and hold property in their own right as separate estate, and, as a necessary consequence, to abridge, in a corresponding ratio, the marital rights of husbands. The capacity to acquire and hold property conferred

10 *

upon *femes covert*, and the separate estate in her slaves secured to the wife, was so much deducted from or carved out of the rights of the husband at common law, arising out of the contract of marriage. Upon the clearest principle, therefore, those rights of the husband are not to be considered as restricted or abrogated, unless by the express and positive language of the statute, or by necessary implication."

Keeping in view these principles, we will turn our attention to the question presented in this case by the act of 1839. By the 2d section of that act it is declared, that " hereafter, when any woman possessed of a property in slaves shall marry, her property in such slaves, and their natural increase, shall continue to her, notwithstanding her coverture; and she shall have, hold, and possess the same as her separate property, exempt from any liability for the debts or contracts of the husband." The 4th section provides, that " the control and management of all such slaves, the direction of their labor, and the receipt of the production thereof, shall remain to the husband, agreeably to the laws heretofore in force. In case of the death of the wife, such slaves descend and go to the children of her and her said husband jointly begotten; and in case there shall be no child born of the wife during such her coverture, then such slaves shall descend and go to the husband and to his heirs." " By the laws in force," prior to the passage of this act (which was the common law), the husband, as absolute owner of the slaves, was entitled, as a matter of course, to the control, management, and use of the product of their labor during the continuance of the marriage, after its dissolution by the death of the wife, and until his own death. This right was a necessary incident of his right of property. The act of 1839, however, divested him of the absolute right of property, leaving to him every other right he had at common law not inconsistent with the provisions of the act, as was clearly announced in the opinion delivered in the case of *Lyon* v. *Knott*, in which the court say, " that the rights of the husband are not to be considered as restricted or abrogated, unless by the express and positive language of the statute, or by necessary implication." In the same case, the court further remarks: " Although the husband

was entitled absolutely to the usufruct in the slaves, by the express provisions of the statute, they remained to the wife as her separate estate; and in the event of children being born of the marriage, they descend to them. The marital right of the husband, in virtue of which he would have been vested with the absolute title of the slaves, was that far, and only that far, taken away and suspended."

The leading object and purpose of the act of 1839 was the "protection and preservation of the rights of married women;" and the legislature evidently intended to effect that object with as little change in the rights of the husband by the existing law, as would attain the object desired. To this end, they left the husband, by the 4th section, the control, management, and direction of the slaves, and the use of the product of their labor. To limit that control and use to the life of the wife, would place the legislature in the strange position of giving to the husband the use of the property during the life of the wife, for the protection and preservation of whose rights the law was expressly passed, and of taking from him that use, upon the death of the very party whose rights were to be protected by the law.

So strange a conclusion will never be reached, unless the language of the act necessarily recognizes it. But it is plain that it does not; for it is perfectly clear, that the fee or absolute ownership in the slaves may descend to the children in entire harmony and consistency with the right of the husband to the use of them during his life. Such is the case in real estate owned by the wife. At the marriage, the title to her real estate is not changed; it remains in her, and on her death descends to her heirs. But the husband, on the birth of a child, becomes a tenant for life by the curtesy, and as such entitled to the rents and profits of the land during his life, and subject to which change the estate descends to the heir.

A similar construction of the 4th section of the act of 1839 would secure every right the legislature intended to protect, would preserve harmony and consistency in the law, and leave in force the rights of the husband existing at the common law, only impaired to the extent necessary to effect the objects for

which the statute was passed. Such was the view of this court in the case of Lyon and Knott, before referred to, in which the court say : " But the interest with which Lyon (the husband) was vested by the marriage, was not the absolute and unqualified title to the property, but only the usufruct for life, with a right to it in fee, in case Mrs. L. should die leaving no issue of the marriage."

The case of *King* v. *Marshall*, referred to by the appellee's counsel, does not touch the point in this case. The rights of the husband are nowhere in that case alluded to, nor were they at all involved. That was a controversy between children, touching the ownership of the property, and the decision there made is entirely consistent and harmonious with the point now contended for.

If the court should even doubt, which I cannot conceive probable in this case, they would certainly sustain the husband's rights, upon the principle of so construing statutes as to change the salutary and benignant principles of the common law only so far as is necessary to carry out the object of the legislature in modifying or changing them.

*T. C. Tupper*, for appellee.

The marriage of appellant took place subsequent to 1839, and his wife died previous to 1846, leaving one child, the issue of said marriage, and a large amount of property held by her at her marriage, consisting of slaves.

This court has held, in *Lyon* v. *Knott* and subsequent decisions, that the capacity to hold property conferred upon *femes covert* and the separate estate in her slaves secured to the wife, and the rule for the descent and distribution of such slaves contained in the act of 1839, was so much deducted from or carved out of the rights of the husband at common law, arising out of the contract of marriage.

Hence arises the only question in this case, namely : Did the act of 1839, called the woman's law, take away from the appellant his common law right to the usufruct of his deceased wife's slaves during his life ? I hold the affirmative.

By the second section of the act, it is provided that the wife's

property in such slaves as she had on her marriage, shall remain to her notwithstanding her coverture, and she shall have, hold, and possess the same as her separate property, &c.   This is an entire abrogation of the common law right of the husband; and the first clause of the fourth section of the act modifies this abrogation only so far as to retain to the husband the right to " the control and management of such slaves, the direction of their labor, and the receipt of the productions thereof, agreeably to the laws then in force."   But this last provision is also modified by a subsequent clause of the same section, providing that on the death of the wife " such slaves shall descend and go to the children of her and her husband jointly begotten."

Now, it has been held by this court in *Marshall* v. *King*, 24 Miss. R. 85, in a well matured opinion of Judge Yerger, that "by the act of 1839, the absolute and unqalified title to the slaves was in the wife."   On her death, by the fourth section, this absolute and unqualified title descends and goes to the children.   This title does not remain in abeyance, or vest for an instant in any other person; but at the wife's death, the title vests in the child or children.

But the husband had the use and control of his wife's slaves reserved to him, agreeably to the laws then in force.   Now, what is the exact extent of this power or right, conferred by the act on the husband ?   By the laws in force, previous to the passage of this act, the ownership as well as the usufruct of the wife's slaves was in the husband.   But surely, the usufruct could not continue under the law, after the ownership ceased to exist.   So long as the property belonged to his wife, or to him, by his marital rights, he was entitled to the possession and use of it, but no longer.   The use must necessarily follow the ownership, in the absence of any enactment or contract to the contrary.   Such were the effects of the common law, or the laws in force previous to the act of 1839.   Hence, we conclude that under the act of 1839, when the wife's property in the slaves was terminated, either by a sale, under the provisions of the act, or by a descent to her children upon her death, all the interest of the husband in the slaves must necessarily end. This construction of the act seemed to be necessary, in order

to give full force to all its provisions; for, if the position contended for by the appellant be correct, we must materially modify the clause of the statute regulating the descent and distribution of the wife's property.

But the case of *Marshall* v. *King* may be regarded as a decision in point. There, the husband and his child were one party, and the children of the deceased wife by a former marriage, the other party, before the court. And the question was, whether the child, by the last marriage, was entitled to all the slaves upon the death of the wife, or whether all the children inherited the property? The court held that under the act of 1846, all her children inherited and were entitled to distribution in equal shares. But if the position contended for be correct, namely, that on the marriage the right to the possession and use of his wife's slaves was vested in the husband, during his life, by the act of 1839, then the decision was incorrect; for the husband was still alive, and a party before the court; and the children would not then have been entitled to a distribution of the slaves. Moreover, the court expressly decide, in that case, that "the use and possession of the wife's slaves was in the husband during her life," thereby sanctioning the position of the learned counsel for the appellees in that case, that "he (the husband) had no estate but for life of his wife, or his own life, if he died first; it was but a usufruct during their joint lives."

It may be insisted by the appellant, that this court has intimated an opinion in his favor, in *Lyon* v. *Knott*, and in *Dabney* v. *Garrett*. But the question was not raised in either case, nor could the point have properly been before the court. The expressions of the court, of "the usufruct of the husband for life," were certainly not intended as an opinion on the question now before the court; and I confidently submit that the reasoning of the court in those cases, does not lead the mind to a conclusion favorable to the appellant in this case.

Mr. Chief Justice SMITH delivered the opinion of the court.

This is an appeal from a decree of the court of probates of Madison county.

Malcom Cameron intermarried with Tennessee Penquite, in

the State of Mississippi, on the 17th of November, 1841. When the marriage occurred, Mrs. Cameron was the owner of a large number of slaves, which were reduced into his possession by Cameron during the continuance of the marriage. Mrs. Cameron died in 1841, leaving a son, Philip P. Cameron, born of the marriage, her sole heir at law. Philip P. died in 1852, and his estate descended to John T. Cameron, his heir at law, who was his half brother, being the son of Malcom Cameron by a subsequent marriage. Malcom Cameron claimed a life interest for his own life in the usufruct of the slaves, and the contest is between him and John T. Cameron, who it is conceded has succeeded to the estate, which passed by operation of law to the heir of Mrs. Cameron. Upon this state of facts it was held by the court, that Cameron's right to the usufruct of the slaves terminated on the death of his wife; and hence, as the guardian of Philip P. Cameron, he was bound to account for their hire.

The question for our consideration, therefore, is this. Did the husband by virtue of a marriage contracted under the act in regard to the rights of married women, approved February 15, 1839, acquire a right for his own life, to the usufruct of the slaves of the wife in the event she should die first leaving issue of the marriage? To determine this question, we must refer to the provisions of the act which define the respective rights of the husband and wife, in reference to the slave property of the latter owner at the time of the marriage.

The second section of the act provides, "that when any woman possessed of a property in slaves, shall marry, her property in such slaves, and their natural increase, shall continue to her notwithstanding her coverture; and she shall have, hold, and possess the same, as her separate property, exempt from any liability for the debts or contracts of the husband."

By the fourth section it is provided, that "the control and management of such slaves, the direction of their labor, and the receipt of the productions thereof shall remain to the husband agreeably to the laws heretofore in force." And further, "in case of the death of the wife, such slaves descend and go to the children of her and her said husband jointly begotten;

and in case there shall be no child born of the wife during such her coverture, then such slaves shall descend and go to the husband and his heirs." Hutch. Code, 497.

In *Knott* v. *Lyon*, 26 Miss. R. 548, the rights of the husband to the slave property of the wife, as affected by the provisions of this statute, were the subject of examination. It was there said that before the enactment of the statute, upon the consummation of the marriage, the whole personal estate of the wife was instantly liable for the debts of the husband, and subject to his unlimited right of alienation. It might be transferred, without consideration, to strangers, wasted in folly and extravagance, or lost by the misfortune of the husband. In either case, the law offered neither assistance nor protection. However ample the fortune which the wife, upon the marriage, brought to the husband, the law made no provision out of it for her support, or the maintenance and education of the children of the marriage. These were the evils which the legislature, by the enactment of the statute, designed to provide against. To effect these purposes, it was necessary to enlarge the capacity of the *feme covert* to acquire and hold property as her separate estate; and as a necessary consequence, to abridge in a corresponding ratio the marital rights of the husband. The capacity to acquire and hold separate property thus conferred upon *femes covert*, and the separate estate in her slaves secured to the wife, was so much taken from or carved out of the rights of the husband, arising out of the contract of marriage at common law.

The subject of inquiry in *Knott* v. *Lyon*, was not the precise question now under consideration. The above remarks are, however, entirely applicable, and suggest the principle by which the rights of the parties to this controversy are to be determined. That principle is, that the rights of the husband in regard to the personal property of the wife must be considered as unaffected by the provisions of the statute, unless where they are changed by express provision, or where the intention to alter them arises from necessary implication.

Let us apply this rule, under the law as it existed prior to the passage of the act. The husband became the absolute

owner of the personal chattels in possession of the wife at the time of the marriage, and of all her choses in action when reduced into his possession. But by the second section of the statute, this right of the husband has been, by express provision, materially changed. The property of the wife in her slaves and their natural increase is continued to her, notwithstanding her coverture; and such right of property is not to be affected by the debts or contracts of the husband. If the statute had closed with these provisions, it might have been matter of doubt whether it was the intention of the legislature not only to deprive the husband of the fee in the slaves of the wife, but also to take from him all right to their usufruct during the continuance of the marriage. But the statute has gone further, and has declared expressly, that the control and management of such slaves, and the receipt of the productions of their labor shall remain to the husband, agreeably to the laws theretofore in force. There is no possibility of misapprehending this provision; and to ascertain the precise character and extent of the interest or estate in the usufruct of the slaves left in the husband, we have only to recur to the previous laws regulating the marital rights of the husband in regard to this description of property, and to the provision under which it descends to the children of the marriage.

Under the previous law, the husband acquired the absolute property in slaves thus situated, and as a necessary incident of such right of property, he acquired also the right to receive and appropriate the proceeds of their labor; limited, however, by the manifest objects of the statute. These objects were to reserve to the wife, in the event that she should survive the husband, her own slaves and to secure to the children born of the marriage the right of succession to the same. The statute has drawn a clear distinction between the right of property in slaves thus situated, and the right to its issues and profits; and has severed the estate in fee-simple from the usufruct. The property of the slaves remains to the wife, as her separate estate, not chargeable with the debts or by the contracts of the husband, whilst the proceeds of their labor are unconditionally vested in the husband. Hence, if a marriage contracted under

Cameron *v.* Cameron.

the statute, is to be regarded as operating a gift or grant of the usufruct to the husband, he will be entitled to it for his own life, unless such an interest is manifestly inconsistent with the objects of the statute.

It is very evident, that the property in the slaves, which is expressly reserved to the wife, is not inconsistent with the construction which vests in the husband an interest or an estate for his own life in the usufruct. For unless the wife should be the survivor, the provisions of the statute would avail nothing to her.

But it is said the provision under which the slaves "in case of the death of the wife descend and go to the children," born of the marriage, is irreconcilable with the husband's right for his own life to the proceeds of their labor. We do not perceive the force of this objection. The statute has severed "the property in such slaves" from the right to the proceeds of their labor. The slaves descend to the children, subject to the rights of the husband acquired by the marriage. The case is precisely analogous to that of real estate which descends to the heir of the wife, subject to the curtesy of the husband.

The first clause of the fourth section of the statute, in terms, leaves to the husband the same right to the usufruct to which he was entitled by the preëxisting laws. Hence, but for the provisions reserving the slaves to the wife, and securing them to the children of the marriage, he would have the unrestricted right to dispose of the proceeds of their labor, not only for his own life, but in perpetuity. This, it is clear, he could not do, as it would necessarily defeat the express provisions of the statute. But the construction which gives to the husband the usufruct during his life, is not only sustained by the spirit of the statute, but it is also consistent with the policy of the law, as in the event of the husband surviving the wife, he would be chargeable with the maintenance and education of the children to whom the slaves would descend.

Let the decree be reversed and the cause remanded.

HANDY, J., concurred in the above opinion.