JESSE B. WALTON et al. *vs.* JAMES OLIVE, Administrator, &c.

J. O. was married in the State of Georgia in the year 1822, and in 1828, becoming embarrassed, the most of the negroes in controversy were sold under executions against the said J. O., as his property to satisfy his creditors; and they were purchased by some of his wife's friends in the State of Georgia, and conveyed to a trustee for the sole and separate use of J. O.'s wife, without any limitation over at her death. In 1836, J. O., his wife, and the trustee (J. B. W.), all removed to this State, with the property, where they resided and were domiciled until the death of Mrs. O. in 1852; and J. B. W. continued to act as trustee, controlling the property. Several other negroes were bought with the proceeds of the property since 1846, the title to which was made to J. B. W., as trustee aforesaid. Upon the death of his wife, J. O. took out letters of administration upon her estate, and returned an inventory of the negroes to the probate court, as the property of his deceased wife; and after the lapse of a year from the grant of letters of administration, the appellants filed their petition as children of Mrs. O. by a former husband, for a division of the property and distribution of their shares; but the probate court dismissed the petition, holding that the property descended to J. O., the husband. *Held*, that J. O. took a present fixed interest in the slaves conveyed to the trustees for the use and benefit of Mrs. O., to take effect in possession in future upon her death; and that interest became fixed before the passage of the acts of 1839 and 1846 in relation to the rights of married women, in virtue of his marriage and her possession of the slaves in the State of Georgia and in this State before the passage of those acts.

J. O., the husband, was entitled by virtue of his marital rights, to these specific slaves and their natural increase held by his wife under the deed of trust, upon the death of his wife. *Lyon* v. *Knott*, 26 Miss. R. 548, cited and confirmed.

But the slaves acquired by Mrs. O., or to her use, since the passage of the act of 1846, should be distributed to the children of Mrs. O. by the former husband.

ON appeal from the probate court of Holmes county; Hon. Alva Wilson, probate judge of Holmes county.

James Olive married his wife, Ailsey, in the State of Georgia in the year 1822, and in the year 1828 Olive becoming much embarrassed, the larger portion of the negroes in controversy were sold as his property under executions against him to satisfy his creditors; and Mrs. Ailsey Olive, the late wife of James

Walton et al. *v.* Olive.

Olive, one of the appellees, in or about the year 1828, then being a resident and citizen of Georgia, acquired a separate estate in part of the negroes in controversy. They were bought and paid for with money of friends of Mrs. Olive, and conveyed, in trust, part to Moss, and part to Mary, for her sole and separate use; subsequently, they were conveyed to appellant, Jesse B. Walton, for the like sole and separate use of said Ailsey Olive, there being in neither deed any limitation over to said James Olive.

In 1836, Mrs. Olive, her husband, and Jesse B. Walton, removed to Holmes county, in this State, with the property, where they resided and were domiciled, until the death of Mrs. Olive in 1852. Walton continued to act as trustee, and controlled the property all the time, and Olive, the husband, exercising no ownership over it. Several other negroes were bought since 1846, the title to which was made to Walton as trustee as aforesaid.

Appellee, James Olive, upon the death of his wife, took out letters of administration upon her estate, in the probate court of Holmes county, and returned an inventory of the negroes, &c., to said court, as the property of said decedent, a copy of which will be found in the record. The appellants are children of said Ailsey Olive, by a former husband, and filed their petition in said court, after the lapse of a year from the grant of administration, against said Olive and his co-appellees, for a division of the property and distribution of their shares to them, and offered to give refunding bonds. The probate court dismissed the petition, holding that the property descended or went to James Olive, as the husband of his intestate, and the appellants appealed from the decree to this court.

*J. M. Dyer*, for appellants.

If the act of 1846 directs the property to go to the children, the next question arising is, Had the legislature the power to make such a law? To determine this, it will be necessary to ascertain what right Olive, the husband, had in the property; whether his right, if he had any, was vested. If his right was not vested, the authority of the legislature to change the line of descent will scarcely be denied.

Fearne defines a vested right to be "an immediate fixed right of present or future enjoyment," or where "the interest does not depend on a period or an event that is uncertain." Con. Rem. 1. Chancellor Kent says, "an estate is vested when there is an immediate right of present enjoyment, or a present fixed right of future enjoyment." 4 Kent's Com. 202. This court, in the case of *Clarke* v. *McCreary*, 12 S. & M. 348, 353, has adopted this as a correct definition of a vested right. At the time of the passage of the act of 1846, the legal title of such of the property in question as then existed was in appellant, Jesse B. Walton, for the sole and separate use of Mrs. Olive. James Olive, the husband, had then no right to the present enjoyment of the property, had no right to take possession of it, or to receive its hire or profits. He could not have recovered it from the trustee by suit. If it had got into the possession of a stranger, he could not, in his own name, have sustained an action for it, either at law or in equity. It could not be subjected to his debts. He could not have sold and delivered it to another. Over it he had no dominion whatever.

He had no fixed present right of the future enjoyment of it, because there was no certainty of his surviving his wife, and it might have been exhausted in her lifetime in her maintenance, or have been subjected to the payment of her debts, or a court of chancery, under the "wife's equity," in a proper case, might have settled the whole of the estate upon her; further, upon her death, her administrator would be authorized to receive the property and apply it to the payment of her debts, even to the consumption of the entire estate, if necessary. This could not be so if the husband had a vested right in the property. How then can it be said that he had a fixed present right to the future enjoyment of it?

Again; was the period or event certain upon which Mr. Olive's interest depended? It certainly was not. There was no certainty of his surviving his wife, no certainty of the property not being exhausted in the payment of her debts; no certainty that a court of equity would not settle the property on her. It was all uncertain and contingent.

The interest of Mr. Olive in this property under the deed of

trust, is not greater, indeed not so great, as the husband at common law had in the wife's personal estate at the time of the marriage, which was not reduced to possession. In the latter, the husband might, immediately upon the marriage, recover the property and hold it during the wife's lifetime and afterwards. In the former, he had no interest whatever until after the death of the wife, if then. This court, in the case of *Clarke* v. *Mc Creary*, 12 S. & M. 347, decides that the woman's law of 1839, which secures to the wife her separate property, takes from the husband, though the marriage was prior to the passage of the act, such of the wife's slaves as are not reduced to possession until after its passage, and that it does not impair any vested right of the husband. In other words, that the husband has no vested right to the personal estate of the wife at the time of the marriage which is not reduced to possession, and that the legislature may secure it to the wife and direct it upon her death to descend to her children. That it infracts no right of the husband, and violates no provision of the constitution.

In *Clarke* v. *Mc Creary*, the material facts are these: C. Clarke married Salina Brazeale in 1830, of which marriage the plaintiff was the issue. In 1835, Mrs. Clarke was divorced from Clarke, and in 1836 married the defendant. Her father died in 1834, leaving a will emancipating his negroes, which was declared void in January, 1839, by the proper court; and in September, 1839, the negroes in controversy, upon the division of her father's estate, came into the possession of McCreary and wife, and she died in 1842. The act of 1839 took effect in April, 1839, before McCreary and wife obtained possession of the negroes. Mary L. Clarke, the child of Mrs. McCreary by her first marriage, claimed the negroes as the heir of the mother, under the law of 1839.

Does not this state of facts present as strong a case in favor of McCreary as that of Olive to the property in dispute? It certainly does, for McCreary's title, before the enactment of the law, was as clear as his, yet the court held that it went to the child, upon the ground that the husband had no vested right to it; that if he had any right, it was qualified, inchoate, contingent, and conditional. That the condition upon which his right

was to, vest was precedent, that is, that he should reduce the property to possession during the coverture, and the law having been passed before the condition was performed, that it intercepted the right of the husband. In the case at bar, Olive had not reduced the property to possession before the passage of the law, and could not possibly have done so before his wife's death, and its passage prior to that event intercepted whatever right he may have had to it. I ask the particular attention of the court to this case, regarding it as decisive of the one at bar.

The case of *Price* v. *Sessions*, 3 How. U. S. Rep. 624, is also directly in point. It went up from this State, and grew out of our woman's law. The facts are these: Russell Smith died in 1836, leaving a will by which he bequeathed to Martha A. Smith, his daughter, part of his estate to be delivered to her on her arrival at eighteen years of age. She intermarried with Sessions, who had the principal management of the property. In 1842, an execution against Sessions was levied upon the property devised to said Martha, when she claimed it as hers

Mrs. Sessions did not arrive at eighteen years of age until after the passage of the act of 1839, and upon that ground, in a well-considered opinion, the court decided that the husband had no vested right in the property, he not having reduced it to possession prior to that law going into effect, and the wife's title was sustained. It is true, Sessions had the actual possession of the property, but he held it as executor, not as husband, and it was of no avail to his creditors. Olive did not have possession of the property during the life of his wife. By the terms of the deed, he was deprived of any possession or control over it. Even admitting that his wife had (though it was legally in the trustee) it would not enure to the benefit of Olive. She held it separate and apart from him. As to it, she was a *feme sole*. Further, by his deposition, above referred to, he disclaims all title to the property, says it was in Walton's control, and that he exercised no authority or ownership over it. By that disclaimer, he is estopped. He cannot set up a claim to the property now. At all events, it shows that he had not its possession, the deeds prove he had no vested right to it, and the

act of 1846, therefore, may well secure it to the wife without infringing any of his rights.

In the case of *Marshall* v. *King*, 2 Cushm. 85, it is held that the act of 1846 operates upon property of the mother, acquired before 1846, notwithstanding she was married in 1843, so as to make it descend as therein directed. The appellant's counsel there contended, that the act of 1846 took away rights which vested in the child of the last marriage, by making children of the first marriage equal heirs with her, and is, therefore, unconstitutional and void. From this conclusion the court dissents, conceiving that at the passage of the last-mentioned act, that the child had no vested right, and that the law of 1846 furnished the rule for the disposition of the slaves. Since the enactment of that law, Olive's interest or rights are no better than the child's, and the act must operate upon it also.

Was Mr. Olive's right of survivorship such a right as could not be affected by legislation? Not at all. He might have been deprived of it, as said in *Clarke* v. *McCreary*, by a court of equity settling the property upon his wife in her lifetime, by its being applied to the payment of her debts, &c. He was not a joint-tenant with his wife. His interest cannot be assimilated to that of a joint-tenant.

According to the common law, the husband, as being entitled to the administration of his wife, was like any other administrator, entitled to her surplus estate. 2 Lom. 200. In other authorities, it is said he is entitled to her property as next of kin. If he claims on either of these grounds, the statute of 1846 may well take it from him, for his claim does not rest in contract or flow from an agreement. If he is regarded as next of kin, he would stand like any other heir, for it is well settled that the law of descents as to heirs, may be changed before the death of the person from whom the property descends — before the rights of the parties are fixed — so as to bind them.

In the case of *Williams* v. *Claiborne*, 7 S. & M. 488, in one clause of the marriage settlement, it was stipulated that the trustee should hold the property conveyed to the use, &c., of said Williams and wife, for and during the terms of their natural lives. She died first, and Williams claimed the property,

but the decision was against him, on the ground that the whole deed evidenced an intention to put the property beyond his reach. By an inspection of the deeds in the case at bar, I think it will be found that Mr. Olive's interest under them is not so great as Williams's was.

The case of *Carter* v. *Carter*, 14 S. & M. 59, is relied on by appellee's counsel to show that the act of 1846 cannot divest rights acquired before its passage. The act of 1839 gave the husband the control of the slaves of the wife, but it was only of such slaves as she had possession of. The act of 1846 gave the wife the possession and control of the slaves. At page 63 of the case cited, Judge Clayton says : " The act of 1839, not of 1846, must govern the rights of the parties," because the " property was in the actual possession of the wife at the time of the marriage in 1841," and came into the possession of the husband. But such is not the case here ; neither the title or possession was in Mr. Olive. It was legally in the trustee, and Olive says actually controlled by him. Hence the case of *Carter* v. *Carter* is not at all analogous to the case at bar.

2d. The children of Mrs. Olive are entitled to the property in dispute, independent of the act of 1846.

Our statute of distribution provides, that if " any person shall die possessed of any goods and chattels and personal estate, not bequeathed, the same shall descend to and be distributed among his or their heirs," &c. Hutch. Code, 624. If there was no decision upon the subject, I think it would be readily conceded that the wife's separate property would descend to her children, for being a person, she would come under the general description of " any person," but I am aware that it has been held that this act does not interfere with the marital rights of the husband.

The statute of 29 Car. 2, C. 3, contains a clause that the statute of distributions of the 22d and 23d Car. C. 10, shall not be considered as interfering with the marital rights of the husband. Toller on Ex'rs, 84, 372. In England, doubts as to his rights to administer upon his wife's estate and take her property, were entertained after the enactment of 22 Car. 2, until the passage of the act of 29 Car. 2. Toller, 372. A similar

provision is in the Virginia act of distributions. 2 Lomax, 199. In our statute no such clause will be found.

Let it, however, be admitted, that our act of distributions of 1821 does not interfere with the marital rights of the husband, and I will ask what right has Mr. Olive to the property in question. By the very terms of the deeds of trust, the property is conveyed from him for the sole and separate use of his wife, and no limitation over to him upon her death.

The case of *Kimball* v. *Kimball*, 1 How. 532, is cited by opposing counsel. That was upon a marriage contract which in substance stipulated that the intended wife's "property should not be taken by execution for the husband's debts," — "that she was to have the use of it during life, and then to dispose of it as she saw proper." The reserved right of appointment she did not exercise, and by the terms of the instrument, she was "to have the use of the property during life" only. She in fact took but a life-estate, and on her death the property went to the husband. By the deeds of trust, Mrs. Olive's interest is not limited for life, but is absolute. In this respect the cases are distinguishable.

*Lowry* v. *Houston*, 3 How. 395, is also cited by appellees. That case is even less favorable to them than *Kimball* v. *Kimball*. There, one Allen was entitled to three negroes, which had been bequeathed to his wife by her grandmother. He sold them to Lowry before reducing them to possession. This was done before the passage of the woman's law of 1839. According to *Clarke* v. *Mc Creary*, if it had been done since he would have had no title to them, and could have conveyed none. Prior to the existence of that law, a husband might make a valid assignment of his wife's choses in action. He also could recover and hold them. Not so with Mr. Olive; he could not at any time have assigned or sold the property in controversy, or make any disposition of it, the title being in the trustee.

In *Fowler* v. *Kell*, 14 S. & M. 68, which grew out of a marriage settlement, which, among other things, stipulated that the property should remain as if the marriage had never taken place, the decision was against the husband. Now, Mr. Olive, in his deposition, solemnly swears that he had no title or right

whatever to his wife's estate, — in effect says, that he had no interest in it, present or future. By that declaration, he is estopped. It shows that the " property should remain as if the marriage had never taken place."

The main question decided in the case of *Hamrico* v. *Laird,* 10 Yerger, is in our favor, though it is relied on by opposing counsel.

The case of *Warren* v. *Haley,* 1 S. & M. Ch. R. 647, was decided by Judge Hughes, as a special chancellor. It does not add much to his laurels. In it he most signally mistakes the law. The property in that case was conveyed in trust to Thomas Freeland, " for the proper use and benefit of Mrs. Ann Warren." The words, for her " sole and separate use," or terms equivalent, not being in the deed, the property did not vest in her, but in her husband. Hill on Trustees, 420 and 421. Yet Judge Hughes remarks, " I am induced to believe, after a full examination of all the cases, that the deed of gift intended to and did secure to Mrs. Warren an estate for her sole, separate use," &c. He winds up, finally, by declaring the property to be the estate of the husband upon the death of the wife. Upon this authority I do not care to waste more words.

The case of *Williams* v. *Claiborne,* 7 S. & M. 488, shows that where property is conveyed in trust, for the benefit of the wife, that it will go to her heirs upon her death.

In *Stewart* v. *Stewart,* 7 Johns. Ch. Rep. 229, so much relied on by opposing counsel, the husband covenanted in the marriage agreement, that the intended wife, during coverture, should have to her own use the property in question, and that she might convey away the same by testament or otherwise. She did not exercise the power of appointment. She was to have the use of the property " during coverture " by the deed. This could be but during her life. Her estate expiring with her life, there was nothing left to go to her children. Mrs. Olive's estate, on the contrary, is not for life, but it is an absolute estate, and therefore cannot be likened to the case referred to.

From the view I take of the authorities, I am led to the conclusion that Mr. Olive's interest was not suspended or dormant during the life of Mrs. Olive, and revived on her death, but that under the deeds of trust he takes no interest whatever.

3d. If the court should be of opinion that Mr. Olive is entitled to what property Mrs. Olive had before the passage of the woman's law, he certainly will not be entitled to what she acquired subsequently thereto. Pullen proves that Mrs. Olive bought one of the negroes in suit, namely, Sally, in 1848. In 1846, Thomas Lockhart conveyed to J. B. Walton, in trust for Mrs. Olive, two other negroes. They were bought with the proceeds of the labor of the other negroes owned by Mrs. Olive. She unquestionably had a life-estate in the negroes bought in Georgia, and what they made would be absolutely hers, and what she bought with their proceeds would likewise vest unconditionally in her, still the probate court decreed all the property to be Mr. Olive's.

For these reasons, it is insisted that the court below erred in dismissing appellants' petition, and I respectfully ask a reversal of its decree.

*Yerger* and *Rucks,* on the same side, cited *Lyon* v. *Knott,* 26 Miss. 548; *Kimball* v. *Kimball,* 1 How. 533; 3 Ib. 394.

*Brooke* and *Anderson,* for appellee.

We propose to show, 1. That by law prior to the act of 1839, commonly called the "woman's law," the separate property of a *feme covert,* where there was no limitation over at her death in the instrument securing it to her, and no disposition made of it during life, at her death enured to the husband *jure mariti;* 2. That the act of 1839, and that of 1846, apply only to property acquired subsequent to their passage respectively, and do not affect in any way personal property held in possession in this State prior thereto.

By operation of the common law, all the personal property of the wife in her possession at the time of marriage, or coming into her possession subsequent thereto, vested absolutely in the husband. Property not so in possession, and choses in action, could only be recovered by the husband at her death as administrator; and when so recovered, he was not compelled to distribute, but the same vested in him *jure mariti.* The husband has always been considered as next of kin to his wife for

purposes of distribution; but lest the statute of distributions, 22 Car. 2, should be considered as conflicting with this doctrine, the statute 29 Car. 2 was passed in England, and a similar one in Virginia, providing that said statute should not be construed as interfering with the marital rights of the husband. "The rights of the husband," says Mr. Blackstone, "not only to administer, but also to enjoy exclusively, the effects of his deceased wife, depends still on the doctrine of the common law."

But in reference to the property of Mrs. Olive, distribution of which is now sought by her children by a former husband, the question is not as to choses in action, or property not reduced into possession; for she died in possession of it, and had it in possession during coverture. Jesse B. Walton held it in trust for her sole and separate use, to secure it from control of her husband during life, but without any limitation over after her death. The property was brought to this State by Mr. and Mrs. Olive in 1835, where the parties have resided ever since. The deeds are of still earlier date. We contend that it now vests absolutely in the husband, the wife being dead, and that it is subject to the same rule as is above laid down, and that our statute of distribution and the acts of 1839 and 1846 do not affect it. It is true, that our statute of distributions contains no such proviso in favor of husbands as is ingrafted upon the English statute by the act 29 Car. 2; but this last statute was only intended to do away with doubts that it was supposed might by possibility arise in reference to the operation of the statute of distributions. It was not intended to repeal or modify it, but simply to settle the construction of it. There is no case in any of the books decided between the respective dates of the two which held that the rights of the husband in and to the personalty of his wife at her death were affected by the first. In fact, neither ours nor the English statute of distributions could have been intended to apply to *femes covert,* for when they were enacted, *femes covert* were not capable of holding personalty, except in a manner not provided for, and of course not contemplated by statute. But this point has already been adjudicated in cases in our own court, which will be hereafter referred to. 2 Story, Eq. § 1389.

The conveyance of personal property to the sole and separate use of the wife, free from control of the husband, was an innovation upon the common law, and when there was no limitation over, operated merely to suspend his rights during her lifetime; on her death, they were revived in full vigor.  3 Atk. 160; 1 Tucker, Com. 115, marg. ref.  " If there be no power of appointment, or if such power be given and be not executed, and the wife dies without exercising her right of alienation, the husband's marital rights are reanimated upon the death of the wife," S. C.   The existence of the trust, without limitation over, leaves the property, at the death of the wife, in precisely the same situation, so far as the right of the husband is concerned, as if there had been no trust at all.   The leading and most important case on this subject, outside of our own reports, is that of *Stewart* v. *Stewart*, 7 Johns. Ch. R. 245, a case the more valuable because its doctrines have been on more than one occasion cited and approved by this court.   By this case the following principles are clearly established: — 1.  Wherever it is intended by a trust or marital settlement to exclude the husband, in the event of his surviving the wife, it is necessary to insert an express provision to that effect in the deed.   2.  If a wife having a power of appointment by marriage articles, which contain no provision on her death, dies without making any appointment, the property goes to the husband as survivor, as if no such power of appointment had been created.   3.  The husband is next of kin to his wife by relation of marriage, and as such takes her property on her death.   These principles have been sanctioned by this court in the case of *Lowry* v. *Huston*, 3 How. 394, decided long since the passage of the statute of distribution.   The court here says, speaking of the marital rights of the husband, " our statute of distribution is silent on the subject.   The husband by statute is entitled to administer on his wife's property; but there is no provision which determines the character of his title, when as such he has reduced it to possession.   His rights are determined by the common law, and we have seen that by its provisions he holds it as his own."  The case of *Hamrico* v. *Laird*, 10 Yerg. 222, I will refer to next, as a case also sanctioned by this court.   It seems that in

24 *

Walton et al. *v.* Olive.

this case there were two settlements in favor of the wife, one made before, and the other after the marriage. By the post-nuptial settlement, the negroes in controversy, which had been purchased with the funds of the wife, were conveyed to Laird as trustee, for the sole and separate use of the wife, free from the control or disposition of the husband, with power of appointment, &c. By the antenuptial contract, the husband expressly relinquished all claim that *he had* or *ever could have* to the estate of his wife, *either in law or equity, that he might acquire by marriage, and agreed that the wife should have the sole disposal and management of the same, with as much right, power, and authority, as if no marriage had never taken place.* On the post-nuptial conveyance or settlement, the court, on the principles of *Stewart* v. *Stewart,* decided the right to the property to be with the husband, as against the wife's heirs; on the antenuptial settlement, they decided against the husband, on the ground that by it he had expressly excluded himself from all title to the property by virtue of his marital right, not only during the coverture, but absolutely and for ever, in consequence of the use of the words italicized above. It is also here held, that the act of 29 Car. 2 was but declaratory of the common law as it stood prior thereto, and of course its non-enactment in this State has no operation on the marital rights of the husband, they not being affected by the statute of distributions. The foregoing cases are valuable, as showing that the same rule of *jure mariti* prevails in cases where the property is protected during the life of the wife, by trust or settlement, from the control of the husband, and that his right, though extinct during such life of the wife, is revived at her death. Such property, though not properly speaking "choses in action," is governed by the same rule.

We will now refer to the cases adjudicated in our own courts. The case of *Kimball* v. *Kimball,* 1 How. 532, is an authority very much to the point. In it the principle is distinctly recognized, that a husband's rights, suspended during coverture by settlement or agreement, where there is no provision extending the limitation beyond her death, are revived at her death.

In this case, the agreement stipulated that the husband

Walton et al. *v.* Olive.

should have "no access to the wife's property, either real or personal, that is to say, said property was not to be taken in execution for the husband's debts, and the husband is not to sell any of it;" and in a subsequent part of the instrument is this provision: " The said Margaret Ragan is to have the use of her property during life, and then to dispose of it as she thinks proper." The language of Judge Sharkey, who delivered the opinion of the court in reference to the clauses quoted, is as follows: " By this two privileges were secured; first, the use of the property during life; and secondly, the power to dispose of it at her death; but they can only be regarded as rights or privileges reserved, the one to be exercised in future, if the party should think proper. But there is no provision in the instrument that can be construed as an exercise of that disposing power. It was but a reserved right of appointment, which, not having been exercised, left the property in the same situation as though no such power had been reserved, and at her death the husband's right becomes complete."

The case of *Warren* v. *Haley,* 1 S. & M. Ch. R. 647, though not a decision of the court of last resort, is valuable as stating the law correctly and forcibly. It is held that where personal property is conveyed to the wife and her heirs for her sole and separate use, and she dies, the husband surviving is entitled to the property *jure mariti,* in preference to her next of kin. The facts in this case are very similar to the one at bar. The property in question was conveyed to Thomas Freeland in trust for the use and benefit of the donor's daughter Ann, and her lawful heirs. The court says: " I think the intention of donor is evident; he intended that his daughter should have a fee in the use and that for her separate use during her life; but here the intention stops; after her death the law steps in and disposes of the fee. In ordinary cases the next of kin, being such as would inherit real estate, are entitled. But between wife deceased and husband surviving, the rule as to next of kin does not apply. The husband is entitled to the chattels of the wife, not as next of kin, but *jure mariti.*" Freeland in the case cited, and Walton in the case at bar, ceased to be trustees on the death of their respective *cestuis que trust,* the trusts being deter-

mined, and the property in both instances became subject to distribution by law. In the authorities cited some discrepancy as to the words next of kin seems to exist, but all concur as to the rights of the husband, whether he claims as such or in *jure mariti*.

The case of *Williams* v. *Claiborne*, 7 S. & M. 488, decided against the husband, turned solely on the stipulations of the marriage settlement; and it is there held that the marital right of the husband to the property of the wife cannot be defeated in any respect, unless by intention to that effect clearly expressed. In the settlement in this case, there was an express provision that after the death of the wife the property was to be held by the trustee for the use and benefit of the heirs of the body of the husband and wife, and in default of such heirs, then for the use and benefit of her right heirs. The wife was also invested with the power of disposing of the property by will, which power she exercised.

The case of *Lowry* v. *Houston*, 3 How., has already been commented on in this connection.

See also the case of *Fowler* v. *Kell*, 14 S. & M.

Having thus established, satisfactorily we hope, the truth of our first proposition, we proceed to the consideration of the second, namely, that the act of 1839 (commonly called the woman's law) and that of 1846, apply only to property acquired by *femes covert* subsequently to their passage respectively, and do not affect in any way personal property held in this State prior thereto.

In relation to that, we contend, first, that it was not the intention of the legislature to give those acts a retrospective operation; and, secondly, that if such were the case, the right of Mr. Olive was a vested one, and could not be thus impaired. The first section of the act of 1839 (Hutch. Code, 497) merely confers the power on *femes covert* to become seized or possessed of property in their own names. In the second section, which prescribes the tenure of the property so possessed, the operation of the law is expressly, in terms, confined to the property of women to be married thereafter; thus excluding all property held in any way by women married prior to its passage. The third

section applies to all women, whether married before or after the passage of the act, but applies only to property to which they thereafter shall or may become entitled.

The act of 1846 is simply an amendment to that of 1839, and by its terms refers only to property provided for by the latter. Sections 2 and 3. It is contended by the other side, however, that the second clause of the 6th section applies to all personalty whether acquired and held separately by *femes covert* before or since 1839. That clause ·is as follows : " If any married woman shall die seized and possessed of real estate or free-hold acquired under the provision of the act to which this is an amendment, her husband surviving shall be entitled to tenancy of the same by curtesy as in other cases ; and if she die pos-sessed of slaves or other personal chattels as her separate prop-erty, leaving issue of her body either by a former husband or by her surviving husband, such slaves and other personal chattels shall descend to her child or children in equal shares ; but if she die without issue surviving her, the said slaves and other per-sonal property shall vest in the surviving husband." It is insisted by counsel for appellant, that because the words " ac-quired under the provisions of the act to which this is an amendment," do not follow " personal chattels," as they do " real estate and freehold " going before, that therefore all slaves and personal chattels held as separate property, whether ac-quired and held by *femes covert* before or since 1839, are included in and are operated upon by the act. This certainly is a very forced interpretation. A correct and grammatical con-struction of the sentence requires the ellipsis or leaving out of the words referred to, thereby avoiding a useless repetition. As the whole sentence is to be taken together as referring to the same subject-matter, the same qualification will apply to all its parts. Such is the practice sanctioned by the rules of grammar in every-day's parlance. In construing a law, the whole of it must be taken together, and the intention of the legislature and the mischief to be remedied must be well considered. The in-tention of the legislature is in this case evident from the title of the act. The title shows that it was to amend the act of 1839, and nothing more. One of the mischiefs to be remedied was

in the 4th section of this act, by which personal property held under provisions of this law went, on the death of the wife, to the surviving husband or her children by him, to the entire exclusion of any children she might have had by a former husband.   The clause alluded to in the 6th section of the act of 1846, remedied this mischief, by putting children by a former husband on an equal footing with those by the last.   Having done this, there is no necessity or propriety in extending its operation further, and making it operate on property not embraced in the original law to which it is an amendment.   " The operation of a law must always be prospective, unless the contrary intention is manifest, even in cases in which it would be admissible in the lawmaking power to give it a retrospective effect."   *Hooker* v. *Hooker*, 10 S. & M. 599.

" Retrospective laws being odious, it ought never to be presumed that the legislature intended to enact them where the words admit of any other meaning."   *Elliot's Executors* v. *Lyall*, 3 Call, 268.   See also 2 H. & M. 181 ; 4 Munf. 108 ; 1 Call, 196 ; 1 Munf. 208 ; 9 Bac. 383 ; 3 Raw. 522.   See also, 6 Munf. 24 ; 5 Raw. 511.

" General words in one clause of a statute may be restrained by particular words in another clause."   1 Munf. 201 ; 2 Call, 406.

" To effectuate intention (in a statute), words obviously intended to be inserted may be considered as inserted."   2 Call, 447, 461.

But I contend, that even if it was intended by the legislature to give that act a retrospective operation, it could not divest rights that accrued or were *in esse* before its passage.   By the laws of Georgia, whence Mr. and Mrs. Olive removed to this State, as well as by the laws in force at the time of domiciliation here, this marital right had vested in Mr. Olive, — a right, it is true, suspended during her life, but nevertheless vested in him to be enjoyed in the event of his surviving her ; and this right could not be affected by subsequent legislation.   7 Ala. R. 32.   Allusion has been before made to an apparent discrepancy in the authorities as to the right of the husband, whether as next of kin or by virtue of *jus mariti*.   The weight of authority, however, is decidedly that it is a marital right.   Such seems to

be the opinion of our court in the case of *Lowry* v. *Huston*, before cited, and also of the court of Tennessee, in the case of *Hamrico* v. *Laird*, 10 Yerger. Being a marital right, it could not be divested by legislation. Chancellor Kent, in the case of *Stewart* v. *Stewart*, speaks of the *jus mariti* and the right of next of kin as one and the same thing. " The husband is next of kin by relation of marriage, and he takes in consequence of being her husband, and by reason of that relation. It is in this sense only that he is spoken of as her next of kin." On the same page, he says: " Where the settlement makes no disposition of the property in the event of the wife's death, and provides only for her dominion over it during coverture, the right of the husband as survivor is a fixed and stable right over which the court has no control, and of which he cannot be divested." 7 Johns. Ch. R. 246. And further: " The settlement cannot be extended by construction beyond the just and fair import of the provisions; and clearly the court cannot create a settlement or a disposition of property in violation of the *jus mariti*, where none has been made by the party." Same page.

The woman's law of 1839, gave to the husband the control and management of the negroes of his wife held under that act, and the proceeds of their labor. This court has decided in the case of *Carter* v. *Carter*, 14 S. & M., that this right was not and could not be divested by the act of 1846 in case of a marriage that took place between 1839 and 1846, — manifestly for the reason that it was a *jus mariti*, a vested right that could not be divested by any act of subsequent legislation; yet such a right is no more a *jus mariti* than the one under consideration, and no more sacred or inviolable. In the case of *Marshall* v. *King*, 2 Cushm., it is held that the act of 1846 so operates upon the fourth section of the act of 1839, as to change or modify the course of descent prescribed by the latter, and thus such operation affects property acquired subsequent to 1839 and prior to 1846. But this decision is based upon the principle that children or heirs have no vested rights in the property of their ancestor; that under the act of 1839 no right could be vested in them, because the husband and wife could by their joint deed alienate the property without their consent. They had not that imme-

diate fixed right, of present or future enjoyment, which is the test of a vested right. But the case of the husband, under circumstances like the present, is very different. The wife cannot, unless there be a power of appointment, convey the property without his consent so as to defeat his interest. His right is only dormant during her life, and is revived the moment she dies. In fact, it is a vested remainder dependent on the death of the wife. "An estate vested in interest is where there is a present fixed right of future enjoyment." 1 Tuck. Com. 131 ; 1 Fearne, 2. " It is not the uncertainty of ever taking effect in possession that makes a remainder contingent, for to that every remainder for life or in tail is and must be liable, as the remainder-man may die, or die without issue before the death of the tenant for life. The present capacity of taking effect in possession, if the possession were to become vacant (that is, if the particular estate were to determine), and not the certainty that it will become vacant before the estate limited in remainder determines, usually distinguishes a vested remainder from one that is contingent." Fearne, 3 ; 2 Black. Com. ; Tucker's Com. ; 2 Black. Com. 132, marg. ref. Tested by this rule, Mr. Olive's interest was clearly vested, though his enjoyment of it depended upon his survivorship.

The case of *Fowler* v. *Kell*, 14 S. & M., arose after the act of 1839, and turned on the language of the marriage contract ; and yet the court say, that under a contract less comprehensive and explicit, the rule that the property reserved by settlement to the wife vested, on her death, in her husband, might apply. They further decide, that neither the act of 1839 or 1846 applied to it, because it was a case of contract. " This contract is the law of the case." Placing the case at bar, then, upon the ground of contract, as from this authority we are authorized to do, it is clearly a vested right, and as such beyond the reach of legislation. And this is, unquestionably, the true ground ; for, according to all the cases cited, the effect of a marriage settlement (which is but a contract) is to vest the property in the husband after the death of the wife, where there is no limitation over and where no power of appointment has been exercised.

In the case last cited, the language of the marriage settlement

or contract was very much the same with antenuptial settlement in the case of *Hamrico* v. *Laird*, 10 Yerger. It was agreed that the property, whether real or personal, of the wife should remain as if the marriage had never taken place. The court say that this operated as an entire renunciation of the husband, not only during coverture but afterwards. But for this entire renunciation, the inference is plain that the property by the contract would have vested in the husband at the death of the wife, though not so expressed in it, but simply by the operation of the law of the contract. A marital right is one resulting from and pertaining to the contract of marriage, and can no more be interfered with or abrogated than the contract itself. Hence, if it be conceded or proven, as has been, that Mr. Olive's right in the premises as claimed is a marital right, it must remain unchanged and unaffected by legislation, and the acts of 1839 and 1846 are inoperative as regards it. And herein lies the distinction between this case and the case of *Marshall* v. *King*, before referred to in 2 Cushm. The interest and right of children in and to the property of their parents, is not a right arising *ex contractu*, but resulting from and dependent on statutory provision, and does not attach or even exist until the death of the ancestor. "*Nemo hæres viventis.*"

It is strenuously insisted, on the other side, that this case comes within the principle of the cases of *Price* v. *Sessions*, 3 How. S. C., U. S., and *Clarke* v. *McCreary*, 12 S. & M. Respect only for the opposite counsel induces us to notice this position. In the two cases referred to the decisions are based entirely on the fact that the wife, in both instances, came into possession of the property after the passage of the act of 1839. In *Clarke* v. *McCreary*, the court well says, that the right of a husband to his wife's property not reduced to possession, is a qualified one, dependent upon the condition that he reduce it into possession during coverture. It is not, therefore, a vested right. The reducing to possession was a condition precedent to the vesting of the estate, and while it was not vested, but entirely contingent, the legislature could change the law in relation to it. "In this case," says the court, "the law was passed before the condition was performed, and intercepted the rights

of the husband." But in the case at bar, the possession has been in Mr. Olive, or rather in the joint possession of Mr. and Mrs. Olive ever since they removed to the State in 1835. They have lived together as husband and wife on the same plantation, and have had charge of the slaves. Walton only held the title as trustee, and had no actual possession. Possession in Mrs. Olive, or in her and her husband jointly, was perfectly consistent with the deeds of trust, and, indeed, was necessary to make them effectual for the purpose intended.

*Bolters & Sheppard,* on the same side.

PER CURIAM.— Upon consideration of this case, we are of opinion that James Olive took a present fixed interest in the slaves conveyed to the trustees for the use and benefit of Mrs. Olive, to take effect upon her death, and that his interest was a vested one *in præsenti,* though only to take effect in possession *in futuro,* upon her death ; that this interest became fixed before the passage of the acts of 1839 and 1846, in relation to the rights of married women, in virtue of his marriage, and of her possession and enjoyment of the slaves in the State of Georgia and in this State before the passage of those acts, and that those acts cannot affect or divest that interest.

Consequently, James Olive, the husband, was entitled, by virtue of his marital rights, to these specific slaves, and their natural increase, held by his wife under the deed of trust, upon the death of his wife. *Lyon* v. *Knott,* 26 Miss. 548–562 ; *Kimball* v. *Kimball,* 1 How. 533 ; *Lowry* v. *Huston,* 3 Ib. 394 ; *Stewart* v. *Stewart,* 7 Johns. Ch. R. 229. And as to these slaves, the decree of the court below dismissing the bill is correct.

But the slaves acquired by Mrs. Olive, or to her use, since the passage of the act of 1846, are in a different condition, and are subject to the rule of distribution established by that act. The evidence tends to show that three of the slaves in controversy were purchased by Mrs. Olive, or to her use, with means derived from the labor of the slaves held to her separate use under the original trust. Under such circumstances, the slaves

so acquired would be subject to the provisions of the 6th section of the act of 1846, and should be distributed to the children of Mrs. Olive by her former husband.

On this ground, the decree of the probate court is reversed, and the cause remanded to be proceeded with according to this view.